On a yearly basis, I got this morning's two, that's 24, that's 0307, George Nadel, as successor trustee of Edward C. Nadel, the Berkman Trust No. 1, dated April 5, 2022, plaintiff, appellee. The Ann Hansen, Bradley Smith, appellee, St. Edward Hansen, William Smith, defendants, appellants. Arguing on behalf of the appellants, Mr. Marshall P. Morris. Arguing on behalf of the appellee, Mr. Stephen J. Kruger. Thank you. Mr. Morris, you may proceed. Thank you, Your Honor. May I close, Your Honor? Yes. Good morning, Justices. Good morning. As the clerk said, my name is Marshall Morris. I'd like to go in just briefly with some facts and then go into the law, which is pertinent, I think, to this case. First of all, on April 5, 2022, Mr. Kruger drafted and Mr. Edward Nadel signed a revised will and declaration of trust, changing his will. And at the time he did that, he divided his estate to one-third, George Nadel, which is his brother. Emily, whose last name I'll never be able to pronounce, is his sister. And one-third also to Annie Hansen, who is sitting back there. That was the gist of what they did. There was no mention at the time that Mr. Edward Nadel, we'll call him Edward, was incompetent. He was thoroughly competent when he executed the trust and the will, and he knew what he was doing at the time. Eight days later, well, three days later, Edward enters into a lease on the property with Annie and her family, which I will just use the word Annie. The lease allowed Annie to live there for a period of time at a reduced rent of $400 a month, which she was supposed to do some things on the property. Her family would live in the main house. Edward would live in the coach house, and they would share certain utilities. Those are facts. Prior to that, Edward had given a letter to a realtor to help find a house for Annie. All of a sudden, though, and he said he would fund it. That's in the record. All of a sudden, things changed. Edward sawms to CUDA, revised his will. Three days later, Edward goes and executes the lease that allows Annie to stay in the property. He wants her there. The reason is, Judge, on May 20th, 2022, Edward died of cancer. So what does that tell us? I think the court confused that Edward knew he was in trouble, and he made changes in his life by doing the will, by getting Annie in there, because he needed her to help him, and that's what I believe was going on. Now, during the trial that took place, a couple things came forward. During the trial, should Mr. CUDA have served as a witness?  Why wasn't that brought up? I knew you were going to ask that question, Judge. I didn't try the case. He should have not been allowed to testify in a dead man's statute. He had conflicts of interest because he represented Edward in the will. He filed the complaint. Yes. He not only filed the complaint, he's here now. He has multiple problems as far as conflicts of interest, but I didn't try the case, or I would have raised him instantaneously. But he was not the advocate at trial, though, correct? He was a witness. It was a member of his firm that did the application. But he did draft the notice of eviction, or the 30-day notice. So he's played a part all along. Well, that issue is forfeited for review. You didn't raise it in your briefs. I would agree with you. There's nothing I could do. It's not argued in the lower court. I think that case would be Schneider 205, which I actually argued in the Supreme Court. But Mr. Kuda did testify that there was an ARDC complaint against him. The subject of it was the three-way conversation between Ann, Ed, and himself, right? He said he might have recalled that conversation. I understand there was something about that. I did not participate in that. I came into the case at the very end when Judge Burke had rendered his decision and sheer panic was going on back there. And I filed a 1203 to try and get an opportunity to say to the court, I think you made a mistake, Your Honor. You applied the wrong law to what is going on here. I got blown out of the courtroom the same day. It was the same day that you filed? You said in your brief that it was the same day that you filed? I came in, I think it was a couple days thereafter they saw me. I want to say maybe it was the 5th or 6th of May because that was the earliest I could get in. And I got to say to the court, this is a 1203, I'm presenting it. The judge said, I'm going to rule on it. And he threw us out of the courtroom basically. So, you know, I was somewhat offended because I thought a 1203, you should be allowed to present your case. It stays the action in theory. It should have been properly briefed and I could have presented it to the court where I thought the law had been misapplied. And if I can jump just one step over, Judge Burke used a balancing theory. Benefit to Mr. Nigel or Edward, benefit to Annie and Company, what it costs Annie, what it costs Edward. Well, the law doesn't say that. I know you've read my briefs, but Illinois law is quite clear. It does not focus on consideration, only the fact that it exists. And there is no balancing of benefits in Illinois. And I think there's a couple, I'm jumping now. Also, I want to say one other thing. Judge Burke did not find fraud. That's important. They had advocated it in their pleading. Judge Burke, to his credit, did not find it. There was no issue of unconscionability that was raised in that courthouse, in that hearing. So those two issues are gone. The next issue that would come up that was gone, Your Honor, was Edward's competency. There is no question about that. It was never raised. Well, Mr. Kuda himself testified that Ed was fully competent. He should have. I'm paraphrasing. He executed the role of trust. He testified for that. He testified that he was fine. Yeah. So then three days later, he'd be fine when he executed the lease, which is one of my promises, Justice. I'm sorry. So that is a fact. Now, if I could jump now into the law, it is important, though, that the Court did not find fraud, did not find unconscionability, and the only issue that Judge Burke relied on was consideration and applied what I call a balancing theory. I'm almost cheating and looking at something that Justice Thomas did in Bureau. But the established Illinois case law rejects the law that the trial court applied. Now, generally, Illinois courts do not examine the adequacy of consideration. They merely verify its existence. And I think one of the good cases on that, there are a bunch of them, actually, that I've cited, is Chandra v. Potter, which is 216 Illinois Act I, 143858, which actually dealt with an attorney contract. Before I go into this, I'm jumping a little bit, and I realize that. Edward did not ever contest the lease. This case is completely different than any of the other cases that have been submitted, and that's important. George Nigel came in and contested the lease. But going back to Chandra, what Chandra says is that the accuracy of consideration is within the domain of the parties. The courts will not interfere. In addition, the courts will not rewrite the lease or the contract to change the benefits of one party to another. But wasn't the main holding of Chandra that the brothers in that case, and one brother said to the other, you know, I don't have to split that case, the case judgment award with you. You didn't do anything. And the court said, you were not counterparties. So, you know, you don't need consideration. There was consideration between the two of you and the lawyer for the fee agreement, and in the fee agreement said the parties were going to split. That is 100% correct, Your Honor. I agree with you. They do go on to say, but if you needed it, the other side had, you know, allegedly the brother brought nothing to the table, had helped with investigation of the claim, had helped find the attorney, went with the attorney. So they said, you know, it was there anyway. I guess I don't dispute what you say, that Illinois courts generally don't look into the adequacy of the consideration. My concern is here where, you know, even at modest, maybe not even, I think Judge Burke found, a 400-month rent did not mean break even in terms of the expenses. That's correct. However, in this case, that rent was never paid. And my concern is, is that rather than call it a want of consideration, I'll call it a failure of consideration, such that rescission could be a remedy, and I realize that is not the basis on which Judge Burke ruled. And that is my concern. If you want to address it, I will also ask you. That is correct, Your Honor. Unfortunately, if I had been the attorney, they wanted to put an escrow in. They wanted to make payments, but no one would accept them. There was never any written demand for rent, correct? None. And Mr. Kuda admitted that. Yes. There were no demands. In fact, there are two petitions for the eviction of my clients. The second one is the one that this case is based on, and that's finally when they came out and talked about dollars and cents. But you are correct, Your Honor, there is a problem, and I admit it. But there's more going on in this case. Consideration, I think, with the cases I've cited, and I keep going with cases if you wish me to do so, is more than just dollars and cents. Edward was in trouble. And what he was doing was trying to help his niece out so he would know that something was going to happen that would take care of her and her family. So that's consideration to him. But the other consideration is Edward was in trouble. He had stage IV cancer. He knew how far down the road he was because he's running around doing the wills, he's making changes. He wanted her on that property because he knew she would take care of him and watch over him. That's consideration, Judge. And you can't put the dollar price on that. And that's why Ed just threw out the $400 price on the rental. He didn't care about the money between us. Obviously, he didn't. He cared that he had somebody there to be with him when things went south. And that's really what this is all about. And I would ask you, Justices, if you think back on your own experiences, in moments when you're facing tragedy like this is, what do you do? You look to see what you can do to help you through it. That's your consideration. Granted, the $400 is minimal. They were helping with other things in the property. You're right. It's a minimal amount. But Edward, during his lifetime, never revoked the lease. He never did anything to do that. George did it. And I submit to the court that George had a fiduciary duty to let the lease go forward because that was his brother's intent. He didn't do that because he was going to get a third of his stake. His sister was going to get a third of his stake, and he would get a third, too. So $150,000, was that a good price for the property? Maybe not. Maybe it's a little low. But that's what this is about. If George followed his fiduciary duty to his brother, he would not have done what he did. And there's some case law on that, too. Let me see. I thought I cited it. Did you argue in your briefs that George had a fiduciary obligation to Annie? I think I did, Judge. Yes, he had a fiduciary duty, not to Annie, but to his brother Edward. And the case is live. I cited it. Let me check if I can get it in here. I looked for it. He had a duty to do that. Well, Mr. Cooter has an obligation to the estate or, yeah, I'm sorry, to the administrator. The administrator has an obligation to not only the beneficiaries, Judge, but to his brother to carry out his wishes. The lease was his wish. He didn't carry it out. He attacked it. And that's where I find offensive. In fact, say one more thing. I know I'm out of time. They even got a judgment against an 11-year-old child. And they did nothing to rescind that judgment. There's an 11-year-old little girl with a $34,000 judgment against her who didn't sign the lease, who didn't do anything. Did they modify that once it was brought to their attention in the 1203? No. They filed a memorandum of law and destroyed their credit and this child's credit also. So that has to be reversed. It's offensive. I'm sorry, Justice. I know I've blown my time, so. You'll have an opportunity to make rebuttals, sir. Thank you, Judge. I presume you wish me to go back now. Thank you, Your Honor. Mr. Kuda, you may proceed and you may approach. Good morning, Justices. I'd just like to mention a couple things right at the beginning. With respect to Mr. Morris's comments regarding conflict of interest, I'd like to point out that really from the beginning of these proceedings, the parents were represented by counsel, and there's never been a motion or any action taken by counsel to recuse me or have me step away from these cases. I'd also like to point out that at the trial, I was not the trial attorney. I was a witness during that case. That is not the end of the analysis.  You know, the reasons for the witness-advocate rule is so that an attorney who has, you know, an interest in the outcome besides just acting as an advocate should not be a fair witness because it compromises your credibility if you testify as a witness, and other policy reasons behind it. So any judge, including the members of this panel, have an obligation to raise ethical concerns, whether a lawyer raises them or not. You understand that? I understand that, yes. So go ahead. Okay. Thank you. I'm a practicing attorney in Woodstock, Illinois, and I represent the appellee, George Nadel. I also represented Edward Nadel for several years prior to his death and prepared his last estate plan in 2018, then in 2022. At this time, I think it's important to address several statements, including in Penance Brief and also this morning, which are not supported by either the trial court record or the report of proceedings. Most of these statements purport to inform the court of Edward's intent with respect to the alleged lease or George and Emily's intentions with respect to disputing that lease. On page 2 of the Repatriate Appellant states that, quote, the court failed to consider that consideration could also be exercised in non-monetary terms. The benefits that Edward wanted and received in addition to rent, which was actually secondary to Edward. That statement is not contained anywhere on the record. It isn't – there was no testimony to that effect, nor was any evidence offered at the trial court with respect to Mr. Nadel's intent in executing the alleged lease. On page 2. Well, you testified to – Pardon? You testified to Edward's intent. Edward's intent with respect to his estate plan. Right. But not with respect to the lease, which – When it came to the lease, you testified you didn't recall a conversation that was mentioned in the ARDC complaint against you, correct? Correct. You said, I don't remember – I could not remember if I had that conversation with them, but I very well might have had that conversation. Do you now recall what the conversation was? No, no, I don't. You still don't remember anything about the lease? No, no. How about the testimony that Edward told the family, and I think the court sustained your objection to this, but the testimony was that Edward told the family that he was going to drop the lease off at your office. You testified that that never happened. That never happened. The last time I saw Edward Nadel was on April 5th, the day he came in to execute his estate plan. I didn't have any conversations with him after that, nor did I see him. Isn't it a logical inference from, you know, what he did on April 5th, that he must have had a conversation with Ann and other members of the family about what he had done on the 5th, and then he executed the lease? Well, I think that was one of the issues we had at the trial court, Your Honor. In our second eviction action, in our amended complaint, we alleged that the lease was a forgery, and the reason for that was that there were numerous conversations between both myself and Ann, George and Ann, her Aunt Emily, where, and this was shortly after, I think there was a family meeting on April 10th that everyone agreed that that meeting occurred, and that there was no mention of the lease. There was no mention of the lease. The trial court ruled that there was no forgery. Right. No proof of forgery. So what we do know is that Edward was very concerned about Ann. Well, she's in. She gets a third of the estate. Right. And Ed hired a realtor to look for a house that he was going to buy for Ann. That's correct. That's Tammy Moore's testimony, and they looked at 10 or 11 houses before Ed then executed the lease to allow Ann to remain in the home. Correct. Those are all facts in the record, right? Yes, but there are also facts in the record that Edward indicated to me in our office conferences that his goal was to sell the house in the spring, downsize, and have created a nest egg for himself in the event he needed some type of care. And I'd like to point out also to the justices that at the time he executed the lease, Edward did not know that he had cancer. There was a companion case pending in McHenry County. It's called the estate of Edward Nadol. Are you a witness in that case? No, I'm not a witness in that case. I'm the attorney for the estate. George serves as the executor of the estate. And in that case, Ann's mother has filed a will and trust contest. We've obtained records, and I believe they were shared with Mr. Morris, and the other attorney's record from Northwestern Hospital. Edward was first diagnosed with cancer at the end of April. He was not diagnosed with cancer at any time before the lease was executed. And, again, these are all statements from Mr. Morris that are not supported by the record in this case. Did he know before he died he had cancer? I do not know that. I know that he didn't mention it to me, and we did have over that course, I believe, I indicated in my testimony between beginning of February through April 5th, I had records, time records indicating numerous conversations with that and then I think a minimum of four office conferences. Why did you take on the role as appellate counsel when you're going to be arguing your own testimony before us? Because I think I know more about the case than... Is that more important than your ethical obligation not to be a witness? Probably not. You know, I don't really have anything else to say in that regard. I didn't realize that it would be... Do you understand the difficulty it poses for us? Now that you bring it up, I do, Your Honor. May I ask a question? Sure. I gathered from the briefs, and my ultimate question is, is this correct, is that Anne's mother lived in that house. She moved, and it was my understanding that Anne more or less moved in right then, right at that time. Yes, I understand. So this would have been before the trust was executed, before the lease. She was already living there. Correct. I would like to address the law of this case. And generally, you know, we agree with, I think, the general rule of law is that the courts will not look at consideration. But then there's cases that go on and say that that consideration is so inadequate or shocks the conscience or just isn't there, then the courts can't take a look at that. And that's what happened in this case. When you look at the lease and you look at the amount of rent and then the landlord's obligations to pay basically all the utilities for the property, there is no consideration that flows to Mr. Nadol. Doesn't that analysis require, and excuse me for interrupting, but that there be circumstances of unfairness on top of this, and I call that want of consideration. Unconscionability is kind of a hard road to hoe, but there needs to be, so shock the conscience and circumstances of unfairness. Are there circumstances of unfairness here given his relationship with Anne, given that, as I understand it, you testified. He was, excuse me, of sound mind at the time and had his faculties. Thank you. I think the circumstances of unfairness are the fact that Edward gives up the use of this property, gives up the ability to sell it, and that was what he expressed his intention was to me when he came and saw me in February and March of 2022. But she was already living there. Pardon? I think you just confirmed Anne was already living there with her family at that time. Well, that's, yes. He, I'm assuming that was by invitation. But just because she's living there doesn't mean she was going to live there for an additional year and a half or so. I mean, all I can tell you is what he. But looking at the time, aren't we looking at the time the contract was made? When we look at unconscionability. Correct. And I have the same question for you if you want to address it that I have for Mr. Morris, which is I see a difference between the want of consideration, which the trial court found, and a failure of consideration such that, let me finish, it would justify rescission. And are there facts here that would support affirmance on a different basis than Judge Berg made his ruling on? I think that was one of the real problems with the case, Your Honor, is the fact that Mr. Edward Madoll, at the time he passed away, was not a wealthy man. His funeral bill, his real estate taxes, and initial expenses of administration depleted all of his liquid assets. He had a house that had, there was no mortgage against the house, so he had 100% equity in the house. But he had nothing else to support him. And I think that really shows how unfair this lease ultimately was to Edward Madoll. You were allowed to testify that the amount of the rent, it shocked your conscience. That's correct. Isn't that a legal conclusion? You did the comparison. I don't know who was paying. We got the lease, and we saw that the afternoon before the trial, and based on the representations that Edward had made to me that he needed to downsize and he needed to create a financial nest egg for himself, when I read that lease and saw that, at the end of the day, he was probably going to be paying out and not receiving anything. Yes, I was shocked by that. I was shocked because of the representations and the discussions I had with my client prior to the time that lease was executed. So am I correct in concluding that you don't know whether he knew that he had cancer because he never discussed it with you? Well, we have his medical records, and he was seeing a doctor, Johnny Anderson, in McHenry on a regular basis, and those records, I think there was a series of visits, and I couldn't have the dates wrong, but it isn't like he just saw Dr. Anderson once every two years. In the six months prior to his death, beginning, I believe, in November and then December, there was a series of visits or communication between Dr. Anderson and Mr. Nadol. At some point, and again, I believe it was in April, there were tests that were ordered. The tests came back, and he was diagnosed with cancer. Is any of that in the record? None of that's in the record, no. But it's information that's been shared by all of the attorneys, because those documents were subpoenaed from Northwestern Hospital and passed off to the attorneys of record. What type of cancer did he have? I think it was brain cancer, as I recall. I would just like to address, just for a second, the monetary judgment against the minor child. No one was aware that there was a minor child. At least none of the attorneys were aware there was a minor child living in the residence until Mr. Morris brought that to our attention. And I believe I addressed it in my brief that we immediately, when that was brought up, we were in court and we immediately informed Judge Berg that no action would be taken to collect that judgment. We agreed that we would not only amend the judgment, but before we had a chance to do that, Mr. Morris filed his notice of appeal. I couldn't find anywhere in the rules or case law or statute that indicated the process for amending an order or a judgment that was already on its appeal up to the appellate court. I talked to other attorneys who handled appeals, and they were at a loss, too. And the consensus amongst my compatriots or my colleagues was just, you know, have your representation on record that you would not collect against her, and that when the appellate court case is finished, then go back to the trial court and amend the order. That's what our intention is. Why would she join as a party defendant if she hadn't signed the lease? She was in possession. So anyone who was in possession of the property. So we named as defendants any person who was in possession of the home. Thank you. I used to work for the trial company, and I wasn't aware that because we were supposed to name the parties that should be joined, and I don't know that we necessarily told anyone that they had to join someone who didn't claim an interest in the property. So if she didn't sign it and you didn't propose or get an admission that she had an interest in the property, I'm not quite sure what the basis for joining her was. Can you edify me if possible? All I can tell you is that at the time we filed our initial suit and sent out our 30-day notice, we had no idea that there was an alleged lease out there. And I think the best we can do is, like I've said when we're done here, is to, I think I even put in my brief to the court, we had no objection, or if this court would vacate that portion of the judgment against minor child, what we can do when we get back to the trial court. I have one more question. With regard to the lease, I think you testified you dismissed the next day rather than go to trial. Why wouldn't you have sought a continuance? Why would we dismiss it? Why wouldn't you have sought a continuance based upon the late notice that there was a lease in question? We attempted to work out with the counsel who was representing the defendants at that time. We requested that we continue the matter for a few weeks so we could try to sort this out to conduct some type of an initial investigation. And the response was, no, you either go to trial tomorrow. Well, why not make a motion to continue to the judge and lay this all out? Why dismiss the case? Because if the judge doesn't, we have no idea if the judge is going to, the only thing we know for sure is that. You just walked in and dismissed the case without prejudice. We know that we can do that. We don't know if we file a motion to continue the trial that we don't know whether or not it's going to be granted. Okay. I mean, the only. . . I've never seen a lawyer do that when they get surprised and they say, okay, we're going to dismiss the case. Well, it wasn't so. We tried to work. . . We tried to work with the other side and were not accommodated in any manner. And. . . Did you dismiss it or not? We. . . It was dismissed without prejudice. Okay. Thank you. Mr. Morris. Thank you, Your Honor. I have to be honest with you, Justice. I have a major problem in that everything that is brought before the court is I, I, I had conversations with Ed. I did this. I did that. And the court is 100 percent correct. You didn't raise it. We're not advocates. I raised it because of our responsibility as justices, but you didn't. . . I didn't try it. So there's a problem. I can't object to something that somebody should have done back then. But I think I did, in the record, my briefs, I did mention there was a conflict of interest. And we've got the dead man statute all over the place here, and he's talking about it. When he stopped Annie from saying anything using the same statute. Unfortunately, I wasn't the lawyer. But I just want to touch on a few things, if I may. One, the court arbitrarily then retroactively decided it was going to charge rent. And it did so based on current market conditions. If the lease was void, ab initio, totally void, there's no duty to pay rent. So the court could not have gone back and read and assessed rent. And secondly, the case law, which I've cited, does not allow the court to go back and rewrite a lease. And there is one case I do want to bring to the court's attention. I'm sure you know it, though. The case is Heard. Heard, Wildman, Harold, Allen, and Dixon, 303 Illinois Act, 3rd, 84th, 1999 case. And what it says, it says, It says the mere inadequacy of consideration in absence of fraud and unconscionability is insufficient to justify the setting aside of a contract. Justice Berg found no fraud. No one raised the issue about conscionability. And there was no question about Edward's competency, because he had signed a will, et cetera. And by whom signing the lease in every single page showed his intent. So those facts are there. Granted, Justice, you're right. The rental is a little low, and they should pay it. But I have an answer for that. There was a hundred pieces. Just so we're clear, the rent can be low and yet be consideration. I agree with that. I am making a distinction that I don't hear you making back, which is that failure of consideration can justify a rescission. I was going to address that, Your Honor. Thank you. The lease provided that Annie had the ability to buy the property for $150K. And she tried to do that. Did she timely exercise that option to buy? Here is the problem with that. It was done 30 days after by the lawyer, after the expiration of the lease. But she was still in possession, and the lease provided for a month-to-month holdover. May I add, didn't the lease say that if that was going to happen, the tenant had to give the landlord 60 days notice? It did, Your Honor. Is there anything in the record that establishes that?  The notice was done 30 days thereafter by counsel who was then the attorney. So should it have been done? Yes. But what I was trying to get to is that they envisioned that the rental would be offset against the purchase price, and Annie was getting a third back. So if you look at this whole transaction, you have to look at the lease and the will together. She's getting a third back, so she pays $150K for the property, and she tendered a mortgage with the notice. She had the money. They sell the property, offset the rent against the other things that are going back and forth in probations, and she has a $50,000 pot that she's entitled to, netting all the expenses, to be used. So the number was a question, but the rent wasn't going to be paid. It was going to be offset in her estate that she would get back from Edwards' estate. So that was it. Are you saying the house was sold? I can't hear you, Judge. Did you say the house was sold, Mr. Holmes? No, the house would have been sold because they offered to buy it. They had a letter. They had a mortgage, and the record's clear, and they said, here, we want to buy it. George said, no, we're not going to sell it to you. That's what I'm saying. If Edward wanted the lease and he wanted the house to go to Annie, what gave him the right not to do it? He breached his fiduciary duty as administrator. I'm sorry. I didn't mean to go overboard. I get a little emotional about this case. Any other questions? No. No, thank you. You said no. No, thank you. Okay. We only had one case on the call, and so I'm going to adjourn the court. I'm going to render a decision in apt time.